W. D. McRae v. J. U. Ketchum and J. B. Ketchum

189 So. 853
Division A
Opinion Filed June 16, 1939

*James H. Finch,* for Appellant;
*Clyde E. Mayhall,* for Appellee.

Buford, J.—Appeal brings· for review a final decree dismissing bill of complaint.

The bill of complaint sought to quiet title in the complainant and to enjoin the defendants from entering upon or cutting, felling or removing any timber, logs or trees from lands in Jackson County, Florida, described as follows:

"E½ of E½ of Section 7, Township 6 North, Range 10 West, less ten acres of cleared land, such ten acres being the 10 acres of cleared land excepted and reserved in deed from Frank Peacock and wife, as grantors, to C. W. Hagerman, dated May 15th, 1900, and recorded in Deed Book LL, page 189, of the public deed records of Jackson County, Florida, on July 6th, 1900."

The plaintiff deraigned his title as follows:

*As to E½ of SE¼ of said Section:*

"1. Deed from J. M. Staley, County Clerk to J. S. Baker grantee, dated July 15, 1873, recorded on July 16, 1873, in Deed Book E page 283 public deed records of Jackson County.

"As to all of said lands (E¼ of E¼ of said Section), with the exception of 10 acres hereinabove mentioned:

· "1. Deed from J. S. Baker and wife, as grantors, to Frank Peacock as grantee, dated January 8th, 1881, recorded on March 1, 1881, in Deed Book H, page 562 Public Deed Records of Jackson County, Florida.

"2. Frank Peacock, grantor, to C. W. Hagerman, grantee, dated May 15, 1900, recorded July 6th 1900, in Deed Book LL, page 189 Public Deed Records of Jackson County, Florida.

"3. Deed C. W. Hagerman and wife to Hagerman Lumber Company dated March 8, 1902, and recorded on March 11, 1902, in Deed Book QQ, page 323, public deed records of Jackson County, Florida.

"4. Hagerman Lumber Co. (deed) to Wm. P. Crenshaw, dated Dec. 3, 1903, and recorded on Dec. 5th, 1903, in Deed Book UU, page 480, public deed records of Jackson County, Florida.

"5. Deed Wm. P. Crenshaw to Mobile Lumber Company, dated Dec. 3rd, 1903, and recorded on Dec. 5th, 1903 in Deed Book UU page 487, public deed records of Jackson County, Florida.

"6. Mortgage by Mobile Lumber Company to Pensacola Lumber Company, dated Dec. 3d 1903 and recorded on Dec. 3d, 1903 in mortgage book WW, page 211 of public mortgage records of Jackson County, Florida.

"7. Foreclosure of mortgage scheduled in Section 6, resulting in sale at public auction, to satisfy the said mortgage, and a Master's deed by E. D. Beggs, Special Master, in Foreclosure case of Pensacola Lumber Company v.

Mobile Lumber Company, conveying said lands to Pensacola Lumber Company, said deed being dated May 1, 1905, and recorded in Deed Book 242, page 34, of the public deed records of Jackson County, Florida.

"8. Deed by Pensacola Lumber Company, a corporation, as grantor, dated May 1, 1905, conveying the above mentioned lands to Marianna Lumber Corporation, as grantee, said deed being of record in the Public Deed Records of Jackson County, Florida, in Deed Book 12, page 11, *et seq.*

"9. Deed by Marianna Lumber Corporation, grantor, to R. L. Montague, as grantee, dated May 15, 1923, conveying the above described lands, which deed is recorded in the public deed records of Jackson County, Florida, in Deed Book 168, page 536 *et seq.*

"10. Deed by R. L. Montague and wife, as grantors, to Midland Timber Company, as grantee, dated July 21, 1923, conveying the above described lands, which deed is of record in the Public Deed Records of Jackson County, Florida, in Deed Book 168, page 584.

"11. Deed by R. B. Scarpa, as Trustee in Bankruptcy of the estate of Midland Timber Company, bankrupt, as grantor, to Midland Holding Corporation, as grantee, dated Nov. 18, 1933, and recorded in the public deed records of Jackson County, Florida, in Deed Book 257, page 444 *et seq.* conveying the above described lands.

"12. Deed by Midlands Holding Corporation, as grantor, to A. T. Goethe and H. M. Goethe, conveying the above described lands, dated Dec. 30, 1933, and recorded in the Public Deed Records of Jackson County, Florida, in Deed Book 257, page 485, *et seq.*

"13. Deed from A. T. and H. M. Goethe, grantors, to W. D. McRae, grantee, dated the 24th day of February,

1934, recorded in Deed Book 265, page 170 of the Public Records of Jackson County, Florida."

The Bill alleges:

"4. Plaintiff alleges that the above described lands are swamp lands, covered with timber, trees, including pine, oak, hickory, ash, and other kinds of trees, and that the plaintiff and his predecessors in title have, during the past thirty (30) years prior to the filing of this suit paid the taxes on said lands, and have exercised such acts of possession and dominion' over said lands as said lands were in their nature and character susceptible of.

"5. Plaintiff alleges that the defendants J. U. Ketchum and J. B. Ketchum have no right or title to, and no interest in, the said lands and have no right, permission or authority to cut or remove any trees, logs or timber from said lands; but the plaintiff avers that the defendants, acting under some pretext and pretense of title, or right, the nature whereof is to the plaintiff unknown, have by themselves and a large force of employees, agents and servants, entered upon said lands, and is engaged in erecting a saw-mill thereon and is preparing and threatening to cut and remove from said land above described trees, timber and logs without the authority, consent or permission of the plaintiff, and all without any authority of law; and the plaintiff avers that unless enjoined and restrained by this Honorable Court, the defendant, and his agents, servants and employees will forthwith and immediately cut and fell valuable trees and timber, the property of the plaintiff, standing and growing on said lands and will remove valuable logs and timber lying and being on said lands, all to the irreparable damage and injury of the plaintiff."

So the bill shows that the lands were conveyed to the plaintiff on the 24th day of February, 1934, but does not

show that the lands were in possession of plaintiffs grantors or in the possession of any predecessor in title.

The defendants answered, alleging, *inter alia:*

"These defendants further say that one J. K. P. Ketchum father of the defendant J. U. Ketchum and grandfather of the defendant J. B. Ketchum is the owner of the fee simple title to the following described lands situated in Jackson County, Florida, to-wit:

"All that portion of Section 7, Township 6, Range 10 lying and being on the east side of Cowarts Creek. That the title of the said J. K. P. Ketchum to said lands is deraigned as follows:

"(a)   Deed by T. W. Baxter and wife as grantors dated October 1st 1898, conveying the last above mentioned lands to J. M. West, as grantee, said deed being recorded in the Public Records of Jackson County, Florida, in Deed Book HH at page 73, and having been filed for record on December 29, 1898.

"(B)   Deed by J. M. West and wife as grantors dated March 2nd, 1900 conveying the last above described property to J. K. P. Ketchum as grantee, which said deed is of record in the Public Records of Jackson County, Florida, in Book EE at page 665, and was filed for record on March 31st, 1900.

"These defendants further say that they are not advised as to the exact acreage contained in the said last above described tract of land, in so much as it has not, in their knowledge, been surveyed or measured but are of the opinion that said tract contains about 20 acres.   These defendants would further show that J. K. P. Ketchum entered into possession of said last above described premises under a claim of title exclusive of any other right founding such claim upon a written instrument as above set forth, as being a conveyance of said premises; that he

enteied into possession thereof immediately after the execution of said deed to him on to-wit: March 2, A. D. 1900, and has held the same as aforesaid for and during a period of more than thirty-five years; that he has held said premises openly, adversely and notoriously against the claims of all persons whomsoever for and during said period of thirty-five years; that it consists of a single lot or parcel of land and that a portion of it has been cleared and improved according to the usual course and custom of the adjoining country and that under Sub-section 4 of Section 4655, Compiled General Laws of Florida, 1927, he has been in the actual, open, notorious and adverse possession of said premises, under color of title, for more than seven years continuously; that a portion of said premises, to-wit: about 5 acres have been cleared and cultivated and that the said J. K. P. Ketchum has used all of said premises for the supply of fuel, or of fencing timber for the purpose of husbandry, or for the ordinary use of the occupant for more than seven years continuously and that by virtue of Sub-section 3 of Section 4655, Compiled General Laws of Florida, 1927, he has held said land openly, notoriously and adverse to the claims of all persons whomsoever, under color of title, for more than seven years continuously. And these defendants say that the said J. K. P. Ketchum is the owner in fee simple of said lands last above described.

"3. These defendants would further show that to-wit: about ten years ago the said J. K. P. Ketchum delivered possession of said premises to the defendant J. U. Ketchum to look after, superintend and care for, for the said J. K. P. Ketcuhm; that during all of the said period of about ten years the said J. U. Ketchum has used and occupied said premises for the said J. K. P. Ketchum as hereinabove set forth.

"4. These defendants further say that they were en-

gaged in cutting and removing trees and logs from said last above described premises at the time the temporary injunction issued herein was served and that they were cutting the same with the permission of the said J. K. P. Ketchum, the owner in fee simple of said lands, and that they had a right to cut the same and have a right to erect a saw mill thereon and to cut and remove such timber therefrom as they may see fit and proper with the permission of the said J. K. P. Ketchum, and were not cutting any timber from any lands of the plaintiff."

The record shows conclusively that a part of the NE¼ of the SE½ and a part of the SE¼ and the SE¼ of Sec. 7, Twp. 6, N., Range 10 W., lies east of Cowarts Creek and all of the NE¼ of the SE¼ and a part of the SE¼ of SE¼ said township and range lies North of Muddy Ford Road. As to possession and ownership the pertinent testimony of the witness J. U. Ketchum is,

"Q. Are you familiar with the lands in controversy in this suit here?

"A. Yes Sir.

"Q. How long have you known them?

"A. Ever since my father bought it.

"Q. When did he buy it?

"A. In 1900.

"Q. From whom did he buy it?

"A. He bought it from J. M. West.

"Q. When he bought it, did he go immediately into possession of the land?

"A. Yes, sir.

"Q. What land did he go into possession of in Section 7?

"A. All lying and being on the east side of Cowarts Creek in Section 7.

"Q. Has he, ever since 1900, claimed to own all of the land east of Cowarts Creek in Section 7?

"A. Yes, sir.

"Q. Is any part of that cleared.

"A. Yes, sir.

"Q. Do you know how much of that is cleared?

"A. I imagine something like three or four acres.

"By Mr. Mayhall:

"Q. Are you familiar with the line between the southeast quarter of the southeast quarter and the northeast quarter of the southeast quarter of section 7?

"A. Yes, sir.

"Q. Is a portion of that cleared land in each of those forties?

"A. Yes, sir.

"Q. I believe that Muddy Ford Road runs a little south of that?

"A. Yes, sir.

"Q. Has that part that is in cultivation, or that portion of the cleared land, been cultivated continuously since your father went into possession of it?

"A. Yes, sir.

"Q. Has there been crops on it every year?

"A. Yes, sir, practically every year. There might have been a year or two that part was used for cultivation.

"Q. And during those years, was any part of it not cultivated?

"A. Yes, sir.

"Q. What part?

"A. On the west side, next to the creek.

"Q. Has it been enclosed with a fence all of that time?

"A. Yes, sir.

"Q. Has it ever been down during these thirty-six years?

"A. No, sir.

"Q. Did your father claim or exercise control or possession of that part of the land in section 7 east of the creek and south of Muddy Ford Road?

"A. Yes, sir.

"Q. How did he claim, or exercise control of that part of the land in section 7, east of the creek and south of Muddy Ford Road?

"A. By getting timber off of it as he needed it.

"Q. Has your father, or you,. with his permission, or his tenants under him, used this woodland east of Cowarts Creek in section 7 for the purpose of obtaining fuel, firewood, stovewood and fence posts and other timber for general repairs, off of that land?

"A. Yes, sir, every year. * * *

"Q. Have you had your father's permission, have you, with your father's permission had occasion to fence that portion of that land south of Muddy Ford Road, or any part of it?

"A. Yes, sir.

"Q. What for?

"A. For hog pasture.

"Q. When did you fence it?

"A. I fenced it in the Spring of '27.

"Q. 1927?

"A. Yes, sir, 1927.

"Q. Did you fence down to the Creek?

"A. Yes, sir, made a water gap down just to the edge of the creek, where my stock could get water.

"Q. Was that fence a part of a complete enclosure?

"A. Yes, sir.

"Q. It enclosed a portion of Section 7, and also a portion of Section 8.

"A. Yes, sir.

"Q. How long did that land stay completely enclosed?

"A. I took some of that fence down in the Spring of 1934, I needed some in another place, I had gotten to let my hogs go out, and I took up some of the wire on the swamp side.

"Q. A portion of that remained after that?

"A. Yes, sir, and there is a portion of that water gap wire still there.

"Q. What time in 1927 did you put that fence up?

"A. In February, I think.

"Q. Do you remember the first time you broke that enclosure?

"A. In January or February. I needed two or three rolls of wire and took it up on the back side of the swamp.

"Q. Did you continue to use it for pasture after that?

"A. No, I didn't I had hogs back there, but they could come out.

"Q. During that time, nobody had occasion to claim that land?

"A. No, sir.

"Q. Had your father had occasion to sell any of that land?

"A. Yes, sir, he sold some to Buck Peel and some to Jennings.

"Q. Do you remember when he sold to Buck Peel?

"A. No sir, but it has been ten or twelve years ago.

"Q. Was anything said about him cutting timber off, by anybody?

"A. No, sir.

"Q. What kind did he cut?

"A. Pine and hardwood.

"Q. Where did he cut it?

"A. He cut some off of section 7 and some off of section 8, and some below the road in section 7 and 8. * * *

"Q. Does Cowarts Creek form a natural boundary that could be easily located on the west of that property?

"A. Yes, sir.

"Q. And the government survey would establish the east and south boundaries?

"A. Yes, sir.

"Q. Are you familiar with the south boundary line of section 8 and 7?

"A. Yes, sir.

"Q. I believe you have been in possession of that land for a number of years?

"A. Yes, sir, for eleven years.

"Q. Your father turned it over to you to look after?

"A. Yes, sir.

"Q. You pay the taxes on it?

"A. Yes, sir.

"Q. During that eleven years, has the cleared portion been in cultivation year after year.

"A. Yes, sir.

"Q. Has it been enclosed with a substantial fence, or enclosure?

"A. Yes, sir.

"Q. Did you use the woodland for any purpose during that eleven years?

"A. Yes, sir.

"Q. For what purpose?

"A. For whatever purpose it was needed for.

"Q. Have you used it every year?

"A. Yes, sir.

"Q. Have you cut your supply of fuel, or a part of it, from it every year?

"A. Yes, sir.

"Q. Have you cut it for farming and other necessary farm repairs, fencing, and so forth, off of it each year?

"A.   Yes, sir.

"Q.   Have you used it as an ordinary land owner would use land in that community, according to custom?

"A.   Yes, sir.

"Q.   How often would you say you have cut fuel and fencing or other timber, off of that land for the ordinary purposes of husbandry?

"A.   Well, every year.

"Q.   Do you usually get your supply of wood for fuel purposes at one time?

"A.   Well, I usually get fuel in the Spring and in the Fall.

"Q.   Twice a year?

"A.   Yes, sir, and get the other off when I need it, peanut poles along in the fall, as we need them.

"Q.   Have you used this land for that purpose every year, according to custom?

"A.   Yes, sir.

"Q.   You have held, for your father, open and notoriously, no secret about your ownership?

"A.   No, sir.

"Q.   The community generally knew that you or your father claimed to own it?

"A.   Yes, sir.

"Q.   Nobody has ever attempted to fence it or cut any timber off it, except with your or your father's permission?

"A.   No, sir.

"Q.   Never attempted to cut any of it?

"A.   No, sir.

"Q.   Never taken down any fence you built, or his?

"A.   No, sir, not without permission from us."

When Ketchum bought the land from his predecessor in title he acquired a written color of title to all that part of Section 7, Township 6 North Range 10 West lying and

being east of Cowarts Creek. Baxter so deeded the lands to West in 1898 and West so deeded the lands to Ketchum in 1900. The testimony shows that the lands in controversy comprise about 20 acres, about 10 acres of which has at all times since 1900 been under fence and cultivation in the possession of Ketchum, and that the remainder has been used for such purposes as such lands are generally used by Ketchum and that from 1927 to 1934 such woodlands were under a pasture fence and used for a hog pasture, the enclosure being broken during that time only for the purpose of then using the land for the purpose of taking timber and wood therefrom. Ketchum relies on his color of title and possession and not on any title in his predecessors. It is immaterial whether or not his grantor had any title at all.

Sec. 4655, Compiled General Laws of 1927, reads as follows:

"*Adverse possession under color of title.*—1. Continued Occupation for Seven Years Required.—Whenever it shall appear that the occupant, or those under whom he claims, entered into possession of premises under the claim of title exclusive of any other right, founding such claim upon a written instrument as being a conveyance of the premises in question, or upon the decree or judgment of a competent court, and that there has been a continued occupaiton and possession of the premises included in such instrument, decree or judgment for seven years, the premises so included shall be deemed to have been held adversely; except that where the premises so included consist of a tract divided into lots, the possession of one lot shall not be deemed a possession of any other lot of the same tract.

"Definition of Possession and Occupation Required.— For the purpose of constituting an adverse possession by any person claiming a title founded upon a written instru-

ment, or a judgment or decree, land shall be deemed to have been possessed and occupied, in the following cases:

"1. Where it has been usually cultivated or improved.

"2. Where it has been protected by a substantial enclosure.

"3. Where (although not enclosed) it has been used for the supply of fuel, or of fencing timber for the purpose of husbandry, or for the ordinary use of the occupant; or

"4. Where a known lot or single farm has been partly improved, the portion of such farm or lot which may have been left not cleared or not enclosed according to the usual course and custom of the adjoining country, shall be deemed to have been occupied for the same length of time as the part improved or cultivated."

In 1 Am. Jur., Adverse Possession, Sec. 207, p. 909, it is said:

"One who enters upon land under color of title is presumed to have entered in accordance therewith, and, therefore, his actual possession of a portion of the property will, by presumption of law, be constructively extended to the boundaries defined by his color of title, except in so far as the land so included is in the adverse possession of another. In other words, the constructive seisin in deed is the equivalent of actual seisin. Beyond such boundaries, however, his possession does not go."

Two C. J. S., Adverse Possession, Sec. 85, p. 638, sets out the above rule in the following language:

"Mere naked possession of land, without color of title, is adverse only to the extent of the actual inclosure, which must be definite and notorious, although possession under a recorded deed has been held adverse to the outside boundaries therein defined regardless of inclosure of only a portion."

In Doyle v. Wade, 23 Fla. 30, 1 Sou. 516, this Court held:

"When defendant is in actual occupancy of a part of the premises in question, to extend the defense of adverse possession to other parts of the tract, he must show that he claims title to the land under a written instrument as being a conveyance of the *whole tract* of which the portion occupied is a part."

See also Kendrick v. Latham, 25 Fla. 819, 6 Sou. 871; Ellicott v. Pearl, 10 Pet. (U. S.) 412, 9 L. Ed. 475; Thompson on Real Property, Vol. 3, Sec. 2519, p. 638; Tiffany on Real Property (2d Ed.) Vol. 2., Sec. 512, p. 1987; Notes in 15 L. R. A. (N. S.) 1241, L. R. A. 1915B p. 1011.

There has been some difficulty in defining what shall constitute an adverse possession under color of title by deed. The Supreme Court of the United States and the courts of some of the States have decided that an entry into possession under a deed containing specific metes and bounds and an actual residence on a small part, give a constructive possession of the whole if not in the actual possession of another. While, by the decisions of other courts, the party, although claiming by deed, is restricted to his actual occupansy by substantial·inclosures.

The Supreme Court of New Jersey in Den, *ex dem.* Saxton v. Hunt, 20 N. J. L. 487, was unable to reconcile the theory of constructive possession of the whole from occupation of a part under color of title to the whole, with the well-settled doctrine that constructive possession follows the legal title. There could not be, the Court insisted, two antagonistic constructive possessions. Under this reasoning the Court required the possessor of a part with color of title to the entire tract to prove acts of ownership, or such conduct with respect to the uninclosed, unoccupied

part, as might fairly evince his intention to assert owner-
ship and claim possession.

The record shows that the uninclosed porton was used
by Ketchum for pasturage. Furthermore, every year
Ketchum cut timber off the land which was used for com-
mercial purposes and for fuel and fencing purposes. These
acts are sufficient to constitute adverse possession. Carter
v. Stewart, 149 Ark. 189, 231 S. W. 887; Moran v. Mosely
(Tes. Civ. App.), 164 S. W. 1093; 1 Am. Jur., Adverse
Possession, Sec. 132, p. 868; 2 C. J. S., Adverse Posses-
sion, Secs. 29, 21, pp. 544, 545.

So the judgment should be and is affirmed.

So ordered.

Affirmed.

TERRELL, C. J., WHITFIELD, and CHAPMAN, J. J., concur.
BROWN and THOMAS, J. J., dissent.

THOMAS, J. (dissenting).—Appellant filed a bill of com-
plaint against appellees praying that the Court decree him
to be the owner of certain property and that appellees be
enjoined from exercising domain over it. The property
was described as the "E½ of E½" of a section "less ten
acres of cleared land, such ten acres being the 10 acres
of cleared land excepted and reserved in deed from Frank
Peacock and wife, as grantors, to C. W. Hagerman, dated
May 15th, 1900, * * *."

Appellant deraigned title from the year 1873 through
mesne conveyances to himself in 1934. The location of
the tract excepted was not determinable from the deeds but
counsel in their briefs fix its location along the east boun-
dary of the property and largely in the northeast quarter
of the southeast quarter of the section and east of Cowarts
Creek, which meanders across the larger tract from its

southwest corner to about midway of the east line of the southeast quarter of the northeast quarter.

The appellees claim title to all of the land east of Cowarts Creek, approximating fifty acres, by deeds executed in 1898 from T. W. Baxter and wife to J. M. West and from West and wife, in 1900, to J. K. P. Ketchum. During a period of thirty-five years appellees have possessed the cleared tract and they take the position that this possession of a tract, excepted from appellant's deed as early as 1881 is possession of all property between the east line of the section and Cowarts Creek. The chancellor agreed with them and dismissed the bill after considering the testimony.

The question is, did appellees' possession of the ten-acre tract, although excepted from deeds in appellant's chain of title antedating the first conveyance in appellees' chain of title become possession of that part of the section east of Cowarts Creek which was also included in appellant's chain? It is more clearly illustrated by the diagram appearing in appellant's brief and approved by appellees.

At the outset the superior title to the parcel of 160 acres of land, east and west of the creek was vested in appellant, excepting only the ten-acre tract which in the chain was set apart even though not definitely described. Long after it was specifically excepted appellees' predecessors in title conveyed all property east of the creek although they had power to transfer but the ten acres.

It is difficult to conceive how possession of the smaller parcel in these circumstances could be expanded to include other land to which grantors had no title.

It is said in I Am. Jur. 908 that: "possession without color may ripen into title to the land actually occupied, but with color it may ripen into title, not only to the land ac-

tually occupied, but to all the land described in the color of title."

This would be the rule had no exception appeared in appellant's chain, but it seems to us that the very definition of adverse possession contradicts the assertion that appellees claim under it. It is possession *hostile* to the true owner. I think it cannot be successfully argued that possession of the tract excepted in the prior chain of title can be in opposition to that chain, and, consequently, cannot become the basis of an adverse interest to other property beyond its borders.

I am not apprised of any case precisely in point but am constrained to conclude that this is the exception to the rule that possession of part of a parcel of land held under color may ripen into title to the whole. Had the ten-acre tract been ignored in appellant's deeds appellees could have become possessed adversely of all land east of Cowart's Creek, that being included in their deed, but when appellants and their perdecessors in title made no claim to the excepted portion, possession of it was not adverse, and lacking this quality there could have been no such possession beyond its boundaries.

For these reasons, I cannot agree with the opinion reached by a majority of the Court.

BROWN, J., concurs.